L. F. Crofoot v. Commissioner.
Crofoot v. Commissioner
Docket No. 17608.
United States Tax Court
1949 Tax Ct. Memo LEXIS 74; 8 T.C.M. (CCH) 863; T.C.M. (RIA) 49236; September 20, 1949
E. B. Crofoot, Esq., 637 Omaha National Bank Bldg., Omaha, Neb., for the petitioner. Elmer L. Corbin, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves a deficiency of $4,520.68 in income tax for the taxable year 1944 arising from respondent's disallowance of a claimed deduction of $10,407.90 for bad business debts. Some of the facts were stipulated and are so found. The stipulation filed is incorporated herein by reference. Findings of Fact The petitioner is an individual residing in Omaha, Nebraska, where he has been actively engaged in the practice of law for a number of years. He filed his income tax return for 1944 with the collector of internal revenue in Omaha. In July 1941 the petitioner agreed *75 to lend to Charles Rosso the sum of $7,000 to complete construction of a restaurant and tavern building in Omaha. On July 26 Rosso and his wife executed a first mortgage on the property to a nominee of the petitioner as security for seven promissory notes dated August 1, 1941, totaling $7,000. Rosso and his wife executed the seven notes on August 1 in favor of petitioner's nominee, who immediatel, assigned the notes and mortgage to the petitioner. During the remainder of 1941 the petitioner advanced the sum of $7,000 to Rosso as the construction of the building progressed. Petitioner later learned that Rosso did not have good title to the property covered by the mortgage. In order to protect the money loaned and to make enough funds available to complete construction of the building, petitioner caused to be created a Nebraska corporation known as Charles Rosso, Inc., hereinafter referred to as the corporation. The original incorporators, directors and officers of the corporation, were Charles Rosso, president; H. Malcolm Baldrige, an attorney who formed the corporation, vice-president; and the petitioner, secretary. The authorized capital stock of the corporation was $40,000, consisting *76 of 400 shares of common stock with a par value of $100 per share. On November 8, 1941, when the corporation was formed, petitioner subscribed and paid $12,000 for 120 shares of stock; 5 shares were issued to Baldrige in payment of legal services; and 45 shares were issued to Rosso for services rendered and as compensation for his investment in the building site which was turned over to the corporation. Thereafter, petitioner looked only to the corporation for payment of the mortgage indebtedness. The 45 shares of stock issued to Rosso were later surrendered by him to the corporation and were re-issued as 5 shares of stock to him and 40 shares to his wife. The corporation later required additional funds for completing construction of the building and for use as operating capital. Between November 1941 and January 1942 the petitioner subscribed and paid $21,000 for 210 additional shares of stock. He also acquired the 5 shares held by Rosso for $450 in April 1942, making his total investment in the capital stock of the corporation $33,450. The 40 shares of stock held by Rosso's wife were purchased by the corporation in May 1942 and never re-issued. Other transfers of stock were made, *77 but they are not material here. The maximum number of shares issued and outstanding at any one time was 380 shares with an aggregate par value of $38,000. Because it could not acquire a liquor license until May 1, 1972, the corporation leased the building to Rosso, who held a valid license, for operations as a proprietorship until that time. The rental was the gross income from the business less operating expenses and $200 a month salary to Rosso, who devoted his entire time to the business. After May 1, 1942, the corporation operated the business itself under its own license. The business was operated at a loss from its inception and required additional operating funds. Petitioner was unwilling to purchase any more capital stock to supply needed operating funds but he did advance to the corporation, as needed, a total of $23,800 on eighteen separate, unregistered, unsecured notes of the corporation between February 9, 1942, and September 22, 1942. The notes were all executed by one or more officers of the corporation, including the petitioner himself in some instances. During March 1942 Rosso's services became unsatisfactory to the corporation. By agreement Rosso resigned as *78 president of the corporation and the petitioner was elected president in his place. The stock held by Rosso was purchased by petitioner, and the stock held by Rosso's wife was purchased by the corporation. Operation of the corporation continued to be unsuccessful, and in the fore part of 1943 petitioner, acting for the corporation, sold the furniture and fixtures and liquor inventory. The liquor license was surrendered and canceled. In October 1943 the corporation leased the building to an electronic development company for $300 per month. On December 29, 1944, the corporation sold the building and real estate to an appliance company for $15,000, thus converting all of the corporation's assets into cash. The $15,000 received for the remaining assets, plus $1,900 in cash on hand, were the total assets of the corporation on December 29, 1944. Petitioner held on December 29, 1944, in addition to $33,450 par value of stock in the corporation, the unpaid mortgage debt of $7,507.20 and $19,800 of unpaid notes. The corporation's funds were first applied to payment of the mortgage debt in full and then to payment of the notes. An unpaid balance remained on the notes in the amount of $10,407.90, *79 which petitioner charged off as a business bad debt in his 1944 income tax return. The corporate existence of Charles Rosso, Inc., has been maintained, but since December 31, 1944, the corporation has owned no assets and engaged in no business. During the period from the time of the creation of the corporation until it discontinued business, the petitioner continuously took an active part in the management of the business, first as secretary and later as president of the corporation. The petitioner approved all building contracts, contracts for entertainers, and amounts spent for advertising and purchase of liquor and other supplies. The accounting records of the corporation were kept by the petitioner's secretary in his law office. Petitioner visited the business about four or five times a week and on an average of twice a week went over the accounts of the business in his office with the manager. Although petitioner had investments in several corporations, he took an active part, during the period here involved, in the business of only this corporation and one other. Opinion LEMIRE, Judge: The only question for our determination in this proceeding is whether the petitioner *80 is entitled to a bad debt deduction in 1944 of $10,407.90, representing the monies advanced to Charles Rosso, Inc., in 1942. The respondent has determined that the debt in question was a nonbusiness bad debt deductible only as a short-term capital loss under section 23(k)(4), Internal Revenue Code. [1]
We think that the respondent's determination must be sustained. There is no doubt that the petitioner suffered the loss which he seeks to deduct; and this fact is not disputed by the respondent. The difficulty with petitioner's position is that the loss was not incurred in his trade or business. The petitioner was not engaged in the restaurant *81 business. That business was conducted by the corporation and was not his individual business. The Supreme Court made it clear in Burnet v. Clark, 287 U.S. 410, that the business of a corporation is not the business of its stockholders or officers. The court there said: "The respondent was employed as an officer of the corporation; the business which he conducted for it was not his own. There were other stockholders. And in no sense can the corporation be regarded as his alter ego, or agent. He treated it as a separate entity for taxation; made his own personal return; and claimed losses through dealings with it. He was not regularly engaged in indorsing notes, or buying and selling corporate securities. The unfortunate indorsements were no part of his ordinary business, but occasional transactions intended to preserve the value of his investment in capital shares. "A corporation and its stockholders are generally to be treated as separate entities. Only under exceptional circumstances - not present here - can the difference be disregarded." The Court was there dealing with "losses resulting from operation of trade or business", within the meaning of section 204 of *82 the Revenue Act of 1921; but the same principles govern the application of section 23(k)(4), dealing with nonbusiness bad debts. See Ways and Means Committee Report dated July 14, 1942, No. 2333, 77th Congress, First Session, C.B. 1942-2, p. 431. [2]
In the cases upon which the petitioner relies, such as Vincent C. Campbell, 11 T.C. 510, the taxpayers were found to be engaged in the business of organizing *83 and financing corporations, such as the one to which the loans were made. See also Maloney v. Spencer, Executrix, 172 Fed. (2d) 638; Washburn v. Commissioner, 51 Fed. (2d) 949; Foss v. Commissioner, 75 Fed. (2d) 326. No such contention is made by the petitioner in this case. His contention is that he was engaged individually in the business of operating the restaurant and tavern. As stated above, however, that was the business of Charles Rosso, Inc., and not of the petitioner. The petitioner elected to have the business conducted through the medium of the corporation and, presumably, enjoyed the advantages which that afforded him. We think that the respondent has correctly determined that the indebtedness representing his loans to the corporation were nonbusiness bad debts. Decision will be entered for the respondent. Footnotes
1. Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
2. A new provision is added providing for special treatment of nonbusiness debts, applicable in the case of a taxpayer other than a corporation. If such a debt becomes entirely worthless within the taxable year, the loss resulting therefrom is to be considered a loss from the sale or exchange of a capital asset held for not more than 15 months. * * * The question whether a debt is one, the loss from the worthlessness of which is incurred in the taxpayer's trade or business, is a question of fact in each particular case, and the determination is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e)↩ is "incurred in trade or business" under paragraph (1) of that section. * * *